UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

UNITED STATES OF AMERICA,

                Plaintiff,

v.

Duane James Neadeau,
*also known as*,
D.J. Neadeau

                Defendant.

Court File No. 17-cr-173 (SRN/LIB)

**REPORT AND RECOMMENDATION**

This matter comes before the undersigned United States Magistrate Judge pursuant to a general assignment, made in accordance with the provisions of Title 28 U.S.C. § 636 and Local Rule 72.1, upon Defendant Duane James Neadeau's ("Defendant") Motion to Suppress Search of the Defendant. [Docket No. 23]. The Court held a motions hearing on September 29, 2017, regarding the parties' pretrial motions.[1] At the motions hearing, the parties requested the opportunity to submit supplemental briefing which was completed on October 23, 2017, and Defendant's Motion to Suppress Search of the Defendant, [Docket No. 23], was then taken under advisement at that time.

For reasons discussed herein, the Court recommends that Defendant's Motion to Suppress Search of the Defendant, [Docket No. 23], be **GRANTED**.

---

[1]The Court addressed the parties' pretrial motions for discovery and production of evidence by separate Order. [Docket No. 46].

## I.    BACKGROUND AND STATEMENT OF RELEVANT FACTS

### A.  Background

Defendant is charged with one (1) count of assault with a dangerous weapon, in violation of 18 U.S.C. §§ 113(a)(3), 1151, and 1153(a) and one (1) count of assault resulting in serious bodily injury in violation of 18 U.S.C. §§ 113(a)(6), 1151, and 1153(a).

### B.  Relevant Facts[2]

The record presently before the Court indicates that on July 17, 2016, Red Lake Police Office Josh Wicker ("Office Wicker") received a call from police dispatch that a bloody man was walking down the road. (September 29, 2017, Motions Hearing, Digital Recording at 11:12–11:13 a.m.). Upon responding to an area on the West End Road, Officer Wicker observed that T.P.S, the victim in the present case ("Victim"), was bloody with lacerations on his person. (Id.). Officer Wicker approached the Victim, and he contacted emergency services. (Id.). Officer Wicker also contacted Criminal Investigator Paul Smith ("CI Smith")[3] to inform him of the situation. (Id.). Emergency services transported the Victim to the Red Lake Indian Services Hospital, and Officer Wicker followed them to the hospital. (Id. at 11:13–11:14 a.m.). CI Smith also responded to the hospital to meet with the Victim. (Id. at 11:47–11:49 a.m.).

Upon arriving at the hospital, Officer Wicker asked the Victim who had stabbed him. (Id. at 11:14–11:15 a.m.). The Victim informed Officer Wicker that he had been stabbed by Defendant. (Id.). The Victim also told Officer Wicker that Defendant lived "two doors down." (Id.). Officer Wicker asked the Victim for further information, such as where the incident occurred, however, the Victim responded that finding out that information was "your job." (Id. at

---

[2] These relevant facts are derived from the testimony of Task Force Officer Travis Putrah, Red Lake Police Officer Josh Wicker, and Criminal Investigator Paul Smith at the September 29, 2017, motions hearing. (September 29, 2017, Motions Hearing, Digital Recording at 10:41 a m.–12:17 p.m.).

[3] CI Smith is currently a conservation officer, however, on July 17, 2016, he was a criminal investigator. (Id. at 11:47–11:49 a m.). Accordingly, the Court will refer to him as a criminal investigator.

11:22–11:24 a.m.). Officer Wicker testified that the only information he received from the Victim was that Defendant "stabbed me. He lives two doors down." (Id. at 11:31–11:34 a.m.). The Victim provided officers with no further information at any time. (Id. at 11:24–11:25 a.m.).

Officer Wicker subsequently learned the exact location of Defendant's residence from other officers. (Id. 11:15–11:16 a.m.). Officer Wicker informed CI Smith that he believed Defendant was a suspect in the stabbing, and CI Smith instructed Officer Wicker, as well as, other officers to go secure Defendant's residence. (Id. at 11:47–11:50 a.m.). Officer Wicker then responded to Defendant's residence on West End Road. (Id. at 11:14–11:16 a.m.).

At some point after CI Smith arrived at the hospital, he called Task Force Officer Travis Putrah ("TFO Putrah") to inform him of the situation. (Id. at 10:41–10:46; 11:49–11:50 a.m.). TFO Putrah testified that, after receiving the information from CI Smith, he attempted to contact Assistant United States Attorney Aanstad to begin securing a search warrant, but he was unable to reach her. (Id. at 10:51–10:53 a.m.). He eventually decide to not pursue a search warrant because of what he described at the hearing as "exigent circumstances," including the rain. (Id. at 11:18–11:19 a.m.).

Officer Wicker was the first to arrive at Defendant's residence, and he arrived at approximately 1:01 a.m. (Id. at 11:47–11:50 a.m.). Officer Wicker, CI Smith, and TFO Putrah each provided testimony describing the location and layout of Defendant's residence. On the date of the incident now at issue, TFO Putrah completed a sketch of Defendant's residence with the surrounding layout. (Def. Ex. 1).[4]

---

[4] Defense Exhibit 1 is the "Diagram/Sketch" TFO Putrah completed of Defendant's residence on the night the incident presently at issue occurred. At the motions hearing, Defense counsel, without objection, offered the "Diagram/Sketch" as Defense Exhibit 1. (September 29, 2017, Motions Hearing, Digital Recording at 11:01–11:03 a.m.).

Defendant's residence is located on the North side of West End Road approximately a couple hundred yards from where Officer Wicker discovery the Victim, and it is surrounded by woods rendering it unable to be seen from the road. (September 29, 2017, Motions Hearing, Digital Recording at 11:04–11:05 a.m.; 11:26–11:29 a.m.; 11:34–11:37). The front of the residence faces South, and it does not have a fence or gate enclosing any portion of it. (Id. at 10:51–10:52 a.m.; 11:05–11:06 a.m.; Def.'s Ex. 1). There are entrances on the South and East side of the residence, however, there is no entrance to the residence on the back of the residence. (Def.'s Ex. 1; September 29, 2017, Motions Hearing, Digital Recording at 11:06–11:07 a.m.). When officers arrived at the residence, there were three vehicles parked in front of the residence. It was raining and dark at Defendant's residence when the officers arrived. (Id. at 11:17–11:18 a.m.; 11:53–11:54 a.m.).

Upon arriving at the residence, Officer Wicker and Officer Graves parked in the driveway in the front of the residence. (Id. at 11:26–11:27 a.m.). Officer Wicker immediately began checking the driveway, front porch area, and front area of the residence for blood. (Id. at 11:27–11:29 a.m.). Officer Wicker then went around the house to proceed to the back yard as he could not see the back yard from the front yard. (Id. at 11:28–11:30 a.m.). Officer Wicker testified the officers could only see where they illuminated the yard with their flashlights as there were no yard lights or other sources of light. (Id. at 11:27–11:29 a.m.). Neither officer knocked on the front door before beginning to search the front or back yard. (Id.).

Upon searching the back yard, Officer Wicker discovered two pools of blood, a bent knife in the shape of a U, and a trail of blood leading to the woods with a matted down section of grass. (Id. at 11:15–11:16 a.m.). Officer Wicker described the pools of blood as a large amount of blood consistent with the wounds on Victim's body. (Id. at 11:16–11:17 a.m.). All of the items

of evidence, including the two pools of blood, the bent knife in the shape of a U, and the trail of blood leading to the woods with a matted down section of grass, were found in the rear of the residence and were not visible from either the front of the residence or the driveway. (Def. Ex. 1; September 29, 2017, Motions Hearing, Digital Recording at 11:00–11:01 a.m.; 11:18–11:19 a.m.; 11:29–11:30 a.m.). Officer Wicker also discovered tire tracks on the East side of the residence. (Id. at 11:15–11:16 a.m.). Officer Wicker also testified that he believed the rain was washing away the pools of blood and washing blood off of the knife. (Id. at 11:17–11:18 a.m.).

At some point after Officer Wicker began looking around the back yard of Defendant's residence, TFO Putrah called Officer Wicker, and Officer Wicker informed him that rain was washing away blood discovered in the yard. (Id. at 10:46–10:48 a.m.). TFO Putrah then called CI Smith and instructed him to begin securing items of potential evidence. (Id.).

In an effort to stop the blood from washing away, Officer Wicker covered the discovered knife with a brown paper bag which he testified was "decently effective" at preventing the rain from washing the blood away. (Id.). At some time while Officer Wicker was searching the back yard, another officer informed Officer Wicker that he had seen a person inside the home move one of the curtains. (Id. at 11:38–11:40 a.m.). After discovering the aforementioned evidence in the back yard of Defendant's residence, Officer Wicker and Officer Graves taped off the area where the evidence was located and took pictures of the evidence they had discovered. (Id. at 11:15–11:17 a.m.).

At approximately 2:06 a.m., and after first searching and securing the back yard of Defendant's residence, Officer Wicker knocked on the front door of Defendant's residence. (Id. at 11:34–11:37). No one responded to Officer Wicker's knock. (Id.). Officer Wicker found the lack of response suspicious, and the officers entered the residence. (Id.). Upon entry into the

residence, law enforcement eventually located two people in the basement, and they placed those two people under arrest after an altercation—based on the officer's entry into the home—occurred. (Id. at 11:03–11:04 a.m.; 11:18–11:19 a.m.). One of those individuals was Defendant. (Id.).

Sometime thereafter, TFO Putrah arrived on the scene, and Officer Wicker began assisting him in collecting evidence. TFO Putrah testified that while taking photos at the scene he believed blood had washed into the large pools of water. (Id. at 11:07–11:08 a.m.). He also noted that all of the items of evidence were located in the back yard of the residence, and he could not see any of the items of evidence from where he initially parked upon entering the property. (Id. at 11:08–11:09 a.m.).

## II.    DEFENDANT'S MOTION TO SUPPRESS SEARCH OF DEFENDANT. [DOCKET NO. 23].

Defendant moves the Court for an order suppressing any evidence obtained as a result of the July 17, 2016, warrantless entry into and search of "the curtilage and residence of Defendant without a warrant." (Def.'s Mot. to Suppress Search of Defendant [Docket No. 23]).[5]

In support of his Motion to Suppress, [Docket No. 23], Defendant argues that the evidence obtained as a result of the July 17, 2016, searches presently at issue should be suppressed because "[l]aw enforcement . . . unlawfully entered Defendant's curtilage without a warrant . . . without exigency and without any attempt to make contact with the Defendant, in violation of constitutional law." (Def.'s Mem., [Docket No. 49], at 13). Defendant reasons that

---

[5] On August 21, 2017, Defendant filed the present Motion to Suppress Search of Defendant, [Docket No. 23], and on October 13, 2017, Defendant filed his memorandum in support of the present motion. [Docket No. 49]. The Government filed its response to the present motion on October 20, 2017. (Gov't Mem. [Docket No. 50]). On October 26, 2017, Defendant filed a Reply to the Government's memorandum. (Def.'s Reply [Docket No. 51]). However, neither the Local Rules for the District of Minnesota nor any Order of this Court permitted Defendant the option to submit a reply memorandum. The Court only allowed Defendant a time to submit a memorandum in support of its motions and the Government time to submit a responsive memorandum before the present motion was taken under advisement. (Minutes [Docket No. 45]). Accordingly, Defendant's Reply Memorandum, [Docket No. 51], was not considered by this Court in the consideration of the present motion.

law enforcement entered the curtilage of his home without a warrant, without his consent, without any attempt to contact him before entry, without the existence of any exigent circumstances, and without any lawful purpose. (Id. at 4–13).

The Government argues that "[t]here were exigent circumstances present that required that law enforcement act to determine if there were other stabbing victims and to collect physical evidence without a warrant." (Gov't's Mem., [Docket No. 50], at 1). The Government also without any specific elaboration generally asserts that "[t]he knife and pools of blood were in plain view to the tribal police officer." (Id. at 2–3).

The Fourth Amendment guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures," and that "no warrants shall issue, but upon probable cause, supported by Oath or affirmation." U.S. Const. Amend. IV. The expectation of privacy as to one's home is at the very core of the Fourth Amendment's warrant upon probable cause requirement. Silverman v. United States, 365 U.S. 505, 511 (1961); Groh v. Ramirez, 540 U.S. 551, 559 (2004) (reemphasizing the principle of the Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable).

This essential Fourth Amendment protection extends to the curtilage of one's home. United States v. Weston, 443 F.3d 661, 666 (8th Cir. 2006). The curtilage "is the area to which extends the intimate activity associated with [one's] home and the privacies of life, and therefore has been considered part of the home itself for Fourth Amendment purposes." Oliver v. United States, 446 U.S. 170, 180 (1984) (citation and internal quotation marks omitted). Accordingly, a home's curtilage "should be treated as the home itself." United States v. Dunn, 480 U.S. 294, 300 (1987).

In situations involving the curtilage of one's home, such as the present case, the Eighth Circuit Court of Appeals has instructed Courts that to determine whether the officers violated Defendant's Fourth Amendment right, the Court must answer two questions: (1) Whether the officers actually entered the curtilage of Defendant's home when they searched the front, side, and backyard; and, if so, (2) whether that entry was reasonable? See, United States v. Wells, 648 F.3d 671, 675 (8th Cir. 2011).

In determining whether a location is considered curtilage the Court considers "factors that bear on whether an individual reasonably may expect that the area in question should be treated as the home itself." United States v. Dunn, 480 U.S. 294, 300 (1987) (quoting Oliver, 446 U.S. at 180). The United States Supreme Court has identified four factors a Court should consider: "[1] the proximity of the area claimed to be curtilage to the home, [2] whether the area is included within an enclosure surrounding the home, [3] the nature of the uses to which the area is put, and [4] the steps taken by the resident to protect the area from observation by people passing by." Dunn, 480 U.S. at 301. These factors are commonly referred to as the Dunn factors.

In the present case, there can be no question that the area which law enforcement entered when they searched the side and back yard of Defendant's home was the curtilage of Defendant's home. Each of the Dunn factors weigh in favor of the area being curtilage. As to the proximity of the area, the side and back yard are immediately adjacent to Defendant's home and of no great size. See, United States v. Hedrick, 922 F.2d 396, 399 (7th Cir. 1991) (finding "the garbage cans located 20 feet from the garage and approximately 50 feet from the back door of the house" to be within the curtilage of the home). Moreover, the entirety of the area at issue, including Defendant's home, is enclosed within a wooded area which law enforcement described as surrounding the home.

Regarding the steps taken by Defendant to protect the area from observation, Officer Wicker and TFO Putrah each testified that the back yard—where all potential items of evidence were discovered—was not visible from the road or the driveway where the officers parked their vehicles, nor even from the front yard, and each officer testified that the house itself could not be seen from the road as the house was surrounded by woods. (September 29, 2017, Motions Hearing, Digital Recording at 11:08–11:09 a.m.; 11:26–11:30 a.m.). Moreover, both Officer Wicker and TFO Putrah also testified that they could only see in the yard of the residence where they specifically shined their flashlights, and there were no lights illuminating the yard. (Id. at 11:08–11:09 a.m.; 11:28–11:29 a.m.). While the exact amount of "woods" is not clearly defined in the records, it is clear from the record that a passerby would not have been able to see the side yard, back yard, or even the house itself, and in any event, the Eighth Circuit Court of Appeals has found that a single bush was sufficient to indicate an effort to maintain privacy. United States v. Burston, 806 F.3d 1123, 1127 (8th Cir. 2015).

While the record is not as clear as to the exact nature of the use of the back yard—or as to its contents other than the potential items of evidence discovered—a person is "not required to keep particular domestic objects on one's lawn in order to maintain a reasonable expectation of privacy." United States v. Wells, 648 F.3d 671, 677 (8th Cir. 2011) (citing United States v. Garrot, 745 F. Supp. 2d 1206, 1212 (M.D. Ala. 2010)). Instead, "[a] backyard that is accessible only by walking around the side of a home is a place generally recognized as 'an area intimately linked to the home, both physically and psychologically, where privacy expectations are most heightened.'" Id. at 677 (citing Florida v. Riley, 488 U.S. 445, 452 (1989) (O'Connor, J., concurring) (quoting California v. Ciraolo, 476 U.S. 207, 213 (1986)); accord Daughenbaugh v. City of Tiffin, 150 F.3d 594, 601–02 (6th Cir. 1998) (concluding that an entire backyard was

within the curtilage of the home); <u>United States v. Jenkins</u>, 124 F.3d 768, 772–73 (6th Cir. 1997) (same)); <u>see</u>, <u>Unites States v. Struckman</u>, 603 F.3d 731, 739 (9th Cir. 2010).

The record in the present case makes clear that the area presently at issue was entirely surrounded by woods, and it was accessible only by walking around the side of Defendant's home. Even if a portion of the back yard was visible from a public space, the right to preclude police entry onto the curtilage of one's home without a warrant is not overcome by the ability to make observations into the curtilage. <u>United States v. Parea-Ray</u>, 680 F.3d 1179, 1186 (9th Cir. 2012) (finding that the district court erred when it conflated the ability to observe inside the curtilage with the right to enter the curtilage without a warrant); <u>see</u>, <u>United States v. Burston</u>, 806 F.3d 1123, 1127 (8th Cir. 2015) (finding a Fourth Amendment violation where a police dog sniffed an open portion of front lawn in front of defendant's apartment window—a portion of which constituted the protected curtilage of defendant's apartment even though the public was not physically prevented from entering or looking at the area other than by the physical obstruction of a bush).

Each of the <u>Dunn</u> factors weighs in favor of the area at issue being curtilage. Additionally, the Government does not argue that the area presently at issue was not curtilage. (<u>See</u>, Gov't Mem., [Docket No. 50], at 2–5) (arguing that exigent circumstances existed to enter the curtilage without a warrant as oppose to arguing that the area at issue is not curtilage).

Accordingly, the Court finds that the area presently at issue—the side and backyard of Defendant's home—are the curtilage of his home. This, however, does not end the Court's analysis. The question remains as to whether the officer's warrantless entry onto the curtilage of Defendant's home was constitutionally unreasonable.

The Fourth Amendment requires that when police officers choose to enter a home they must first obtain consent or a warrant, or, in exigent circumstance, have probable cause. <u>United States v. Wells</u>, 648 F.3d 671, 679 (8th Cir. 2011) (citing <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 222 (1973; <u>Payton v. New York</u>, 445 U.S. 573, 586–87 (1980)). Those same rules apply in the present case because the law treats the curtilage as part of the home. <u>See</u>, <u>Wells</u>, 648 F.3d at 679 (citing <u>Oliver v. United States</u>, 446 U.S. 170, 180 (1984)).

There is no dispute in the present case that Officer Wicker did not have Defendant's express consent or a warrant when he began searching Defendant's yard for evidence. Even when there is no implied consent to enter, warrantless entry into the home or curtilage may also be justified if there are exigent circumstances however. <u>United States v. Cisneros–Gutierrez</u>, 598 F.3d 997, 1004 (8th Cir. 2010) (citing <u>Payton v. New York</u>, 445 U.S. 573, 590 (1980)). Therefore, the warrantless search of Defendant's yard can only be lawful under either (1) an exigent circumstance or (2) the line of cases recognizing a knock and talk rule which provides that "no Fourth Amendment search occurs when police officers who enter private property restrict their movements to those areas generally made accessible to visitors—such as driveways, walkways, or similar passageways." <u>United States v. Reed</u>, 733 F.2d 492, 501 (8th Cir. 1984).

The knock and talk principal permits police officers—consistent with the Fourth Amendment—to approach the front door to announce their presence, make inquiries, and request consent to search the remainder of the property." <u>Wells</u>, 648 F.3d at 679 (citing <u>United States v. Weston</u>, 443 F.3d 661, 667 (8th Cir. 2006)). While an exigent circumstance exception to the warrant requirement permits a warrantless entry into a person's home or curtilage when the needs of law enforcement are so compelling that a warrantless search is objectively reasonable. <u>Mincey v. Arizona</u>, 437 U.S. 385, 392 (1978). "Such exigencies include the need to render

emergency aid to an injured occupant, hot pursuit of a fleeing suspect, and the need to prevent the destruction of evidence." <u>Carpenter v. Cage</u>, 686 F.3d 644, 648 (8th Cir. 2012) (citing <u>Kentucky v. King</u>, 563 U.S. 452, 460 (2011)). Under the emergency aid or immediate danger exception, law enforcement may enter one's home or its curtilage "without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury." However, the existence of an "emergency assistance" exception requires an "objectively reasonable basis" to believe that someone within the house or curtilage is in immediate need of assistance. <u>Michigan v. Fisher</u>, 558 U.S. 45, 47 (2009) (quoting <u>Brigham City v. Stuart</u>, 547 U.S. 398, 405 (2006)). Under the destruction of evidence exception police may enter one's home or its curtilage "to prevent the imminent destruction of evidence." <u>King</u>, 563 U.S. at 460.

The burden is on the Government to establish the existence of an exigency. <u>United States v. Robinson</u>, 414 U.S. 218, 243 (1973). Moreover, police may not create the exigency that justifies the warrantless search. <u>King</u>, 563 U.S. at 460–61. An officer who violated the Fourth Amendment prior to the awareness of the exigency will not be protected pursuant to the Fourth Amendment by the exigency doctrine. <u>Id.</u>

Defendant argues that the entry onto the curtilage of his home was unreasonable as no exigent circumstances then objectively existed. (Def.'s Mem., [Docket No. 49], at 7–13). The Government argues that "[t]here were exigent circumstances present that required that law enforcement act to determine if there were other stabbing victims and to collect physical evidence without a warrant." (Gov't Mem., [Docket No. 50], at 2). Specifically, the Government argues that "[l]aw enforcement needed to act immediately to preserve evidence" as "[t]he weather-rain-was washing the evidence away." (<u>Id.</u> at 2). In so arguing, the Government asserts that the facts of this case "are almost identical to the facts in" <u>United States v. Chipps</u>,

410 F.3d 438 (8th Cir. 2005). The Court finds the Government's arguments unpersuasive, and it notes that the Government's analogy between Chipps and the present case is based on a misstatement of the facts in the present case.

Chipps involved a defendant who argued that "the police violated the fourth amendment when they followed [a] trial of blood and seized [a] sweatshirt," however, the defendant in that case admitted that law enforcement's "presence at his front door was legally unobjectionable and that the first drop of blood was plainly visible from the area immediately in front of the door to his house." Id. at 442. In Chipps, a tribal police department dispatcher informed a special agent that an assault had occurred at defendant's residence. Id. Upon arriving at the residence, the special agent was standing near the front door of the residence, and he "saw a drop of blood on the ground." Id. When the special agent approached the blood drop, "he discovered a trail of blood, which he followed for twenty or thirty feet to a blood-stained sweatshirt . . . took some pictures of the trail of blood and the sweatshirt and seized the sweatshirt as evidence." Id. The Court in Chipps found that the special agent did not violate defendant's Fourth Amendment right reasoning that the special agent "could have reasonably believed that the trail of blood indicated that someone's life was in immediate danger, especially as he has been told that a person had been assaulted at [defendant's] residence" and the plan view doctrine justified the special agents seizure of the sweatshirt as he "legally arrived at the place from which he could see the sweatshirt, the incriminating nature of a bloody sweatshirt at the site of a potential assault was obvious, and he had a legal right to access the shirt—it was right in front of him on the ground." Id. at 442–43.

In arguing that the present case is analogous and "almost identical" to Chipps, the Government asserts that "[t]here was probable cause to believe that an assault occurred at the

defendant's home," that Officer Wicker "was literally walking from the front door to the side of the house where the second door was located," and that "[t]he victim said that he had been assaulted at DJ's house." (Gov't's Mem., [Docket No. 50], at 2–4). Although the Government asserts that Officer Wicker was walking from the front door to the side door when he discovered the items of evidence, Officer Wicker's hearing testimony makes abundantly clear that he did not approach the either door of the residence until <u>after</u> he had search the side and back yard for evidence. Officer Wicker specifically testified that he began searching the yard immediately upon arriving at Defendant's residence, and he did not go to the door of Defendant's residence until after he searched the yard, discovered the potential items of evidence, and secured the yard—approximately an hour after he had initially arrived at Defendant's residence. (September 29, 2017, Motions Hearing, Digital Recording at 11:27–11:30 a.m.; 11:34–11:37 a.m.).

Moreover, although the Government asserts in its memorandum that "[t]he victim said that he had been assaulted at DJ's house," (Gov't's Mem., [Docket No. 50], at 4), Officer Wicker's hearing testimony also makes clear that the only information he received from the Victim at any time was limited solely to that Defendant "stabbed me. He lives two doors down." (September 29, 2017, Motions Hearing, Digital Recording at 11:31–11:34 a.m.). In fact, Officer Wicker testified that when the Victim was specifically asked <u>where</u> the assault occurred, the Victim responded to Officer Wicker that finding out that information was "your job." (<u>Id.</u> at 11:22–11:24 a.m.). This record also militates against the Government's factual assertion that "[t]here was probable cause to believe that an assault occurred at the defendant's home." (Gov't's Mem., [Docket No. 50], at 3).[6]

---

[6] It is also relevant to keep in mind that Officer Wicker did not first encounter the Victim at the Defendant's residence, but rather out on the public roadway. (September 29, 2017, Motions Hearing, Digital Recording at 11:12–11:14 a.m.).

These factual distinctions, as well as, other disparities between <u>Chipps</u> and the present case render <u>Chipps</u> inapposite to the present case.

For instance, in <u>Chipps</u> the Court noted that an "[e]xigent circumstance exist if a reasonable law enforcement officer could believe that a person 'is in need of immediate aid.'" <u>Chipps</u>, 410 F.3d at 442 (quoting <u>Mincey v. Arizona</u>, 437 U.S. 385, 392 (1978)). The Court noted that under this exigent circumstance exception "police may enter property without a warrant if they could reasonably believe that a person is in need of immediate assistance." <u>Chipps</u>, 410 F.3d at 442 (citing <u>Collins v. Bellinghausen</u>, 153 F.3d 591, 596 (8th Cir. 1998)). In <u>Chipps</u>, the special agent had been informed that an assault had occurred at Defendant's residence and he saw blood from a location near the Defendant's front door; the victim in that case had <u>not</u> <u>yet</u> been discovered. Whereas, the victim in the present case had already been discovered and transported to the hospital long before Officer Wicker arrived back at Defendant's residence, and Officer Wicker had no information whatsoever indicating either the actual location where the assault occurred or that there might even possibly be a second assault victim. As already noted, Officer Wicker had not been informed by the Victim where the assault had occurred, did not observe any violent behavior at Defendant's residence, did not hear any evidence of any assault or immediate danger, and did not see any signs to indicate that anyone had been injured at Defendant's residence until <u>after</u> Officer Wicker entered into and began searching the curtilage of Defendant's home. Additionally, the special agent in <u>Chipps</u> saw the blood drop at a location where he had been informed an assault occurred <u>before</u> he had arrived at defendant's residence and while the special agent was first near the front door to announce their presence in response to the report of an assault at the residence. In contrast, in the present case Officer Wicker testified that he only approached the front door after he had already searched the

curtilage of Defendant's home for evidence, that he had immediately began searching for blood evidence when he first arrived at Defendant's residence, that he had not previously been told the location where the assault had occurred, and that none of the items of potential evidence were visible from the driveway or front of the residence.

To the extent that the Government argues that Officer Wicker could "walk around the house to determine if there were any other stabbing victims." (Gov't Mem., [Docket No. 50], at 5). This argument is also unpersuasive as it is unsupported by the present record. Officer Wicker had not received any information from the Victim that the assault had in fact occurred at Defendant's residence nor any information whatsoever that there might possible be other victims. Any suspicion that Officer Wickner had that there were additional victims was based solely on speculation, and such speculation cannot support an "objectively reasonable basis" to believe that someone within the house or curtilage is in immediate need of assistance. See, Storey v. Taylor, 696 F.3d 987, 996 (10th Cir. 2012) (concluding that "a report of a loud argument—without more—that has ceased by the time an officer arrives, although relevant to the exigent circumstances inquiry, does not alone create exigent circumstances . . . additional facts that would significantly increase the likelihood of violence" are required). The Government fails to articulate and the Court cannot deduce how an officer's mere speculation that an additional victim may exist, without any other basis in fact, translates to a "reasonable law enforcement officer" believing that a person is in need of immediate aid. See, United States v. Timmann, 741 F.3d 1170, 1180–81 (11th Cir. 2013) (finding no exigent circumstance where police responded to a service call involving a bullet hole in an apartment wall and then 39 hours later entered defendant's apartment because "[t]he officers observed no violent behavior, nor did they see or

hear evidence that a fight had taken place or that anyone had been injured, other than finding a single bullet hole").

The Chipps Court's plan view doctrine analysis is also inapposite to the present case. The Court in Chipps noted that under the plan view doctrine "a law enforcement officer may seize an object without a warrant if the officer did not violated the fourth amendment in reaching the place from which the object could be plainly viewed, 'the object's incriminating character is immediately apparent, and the officer has a lawful right of access to the object itself.'" Chipps, 410 F.3d at 442 (citing United States v. Collins, 321 F.3d 691, 694 (8th Cir. 2003), cert. denied, 540 U.S. 1076 (2003)). After finding that the special agent was legally at the home due to the "immediate danger" exception, the Chipps Court explained that "the incriminating nature of a bloody sweatshirt at the site of a potential assault was obvious, and he had a legal right to access the shirt—it was right in front of him on the ground." Id. at 442–43.

In the present case, Officer Wicker had not legally arrived at the place from which he saw the items of potential evidence. Officer Wicker specifically testified that he could not see any of the items of evidence from the front yard driveway where he parked, and that he could not see anywhere except where he directly shined his flashlight. (September 29, 2017, Motions Hearing, Digital Recording at 11:27–11:30 a.m.). Officer Wicker was not able to see any of the items of potential evidence until after he began searching the curtilage of Defendant's residence. Accordingly, despite the fact that there was no exigency which allowed Officer Wicker to lawfully enter the curtilage in this case and immediately begin to search for evidence without a warrant, the plain view doctrine under the specific facts of this case likewise does not apply to Officer Wicker's discovery of the items of evidence in the back yard of Defendant's residence as

17

they were not readily visible from either the drive or front of Defendant's residence upon Officer Wicker's initial arrival.

The Government also argues that the exigent circumstance regarding the destruction of evidence exists in the present case because the rain that evening was washing away the blood Officer Wicker had discovered, and any failure to act by Officer Wicker would have resulted in critical evidence being destroyed. While, in certain circumstances, the destruction of evidence exception allows warrantless entry into one's home or curtilage "to prevent the imminent destruction of evidence," King, 563 U.S. at 460, "[i]t is . . . an essential predicate to any valid warrantless seizure of incriminating evidence that the officer did not violate the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed" because "the Fourth Amendment requires . . . that the steps preceding the seizure be lawful." Id. at 463 (citing Horton v. California, 496 U.S. 128, 136–40 (1990)).

In the present case, the Court has already determined that Officer Wicker was not lawfully upon the curtilage of Defendant's home in the first instance when he was able to view the items of evidence he discovered. Accordingly, Officer Wicker's warrantless search of the curtilage of Defendant's residence, and the subsequent seizure of the items of potential evidence resulting therefrom, cannot be saved under the destruction of evidence exception. See, King, 563 U.S. at 460–63. Even the Government's argument that the realities of obtaining a search warrant would have led to the destruction of evidence due to the distance of the nearest magistrate is waylaid by the fact that, according to his own testimony, Officer Wicker could not have observed the items of potential evidence to describe in any affidavit in support of a warrant application without first unlawfully entering upon the curtilage of Defendant's home.

To the extent the Government argues that Officer Wicker's presence in the yard was lawful under the so called "knock and talk" exception because he was merely walking from the front door to the side door, the Court also finds that argument unpersuasive on the basis of the present record as well. As already noted above, the knock and talk principal permits police officers—consistent with the Fourth Amendment—to approach the front door to announce their presence, make inquiries, and request consent to search the remainder of the property." Wells, 648 F.3d at 679. The classic application of the knock and talk rule occurs when police enter a property through an unlocked gate and proceed up the walkway to the front door to inquire of the resident or request consent to search inside a home. See, e.g., Nikolas v. City of Omaha, 605 F.3d 539, 545–46 (8th Cir. 2010). The Eighth Circuit Court of Appeals has identified two possible justification for this knock and talk rule: (1) "that areas generally made accessible to visitors, such as driveways, walkways, or similar passage ways, are simply not areas in which a person can reasonably maintain any expectation of privacy" and (2) "that homeowners grant members of the visiting public—mail carriers, sanitation workers, neighbors, and Girls Scouts, to name a few—an implied consent to enter these area for those purposes that accompany the normal interactions of a social, civilized society." Wells, 648 F.3d at 679. (internal quotations and citations omitted).

To the extent the knock and talk rule is grounded upon the tenant that driveways, walkways, and other similar passageways are not areas in which a person can reasonably maintain any expectation of privacy, the record now before the Court in the present case makes clear that Officer Wicker did not observe any of the items of evidence now at issue from a driveway, walkway, or other similar passageway. Officer Wicker testified that he had to traverse across the curtilage to the back of the house in order to discover the potential items of evidence

and that he could only see where his flash light illuminated; clearly then he could not see any of the potential items of evidence from the front of the residence or the drive where he parked. (September 29, 2017, Motions Hearing, Digital Recording at 11:27–11:30 a.m.).

"To the extent that the 'knock and talk' rule is grounded in the homeowner's implied consent to be contacted at home," the Eighth Circuit Court of Appeals has declined "to extend the 'knock and talk' rule to situations in which the police forgo the knock at the front door and, without any reasons to believe the homeowner will be found there, proceed directly to the backyard." Wells, 648 F.3d at 680. In the present case, Officer Wicker's testimony makes clear that he forwent knocking on the door to instead begin immediately searching the curtilage of Defendant's home for evidence. He specifically testified that he immediately began checking the driveway, front porch area, and remaining yard of the residence for blood without any belief or knowledge that Defendant would be found in the yard, and he specifically testified that he did not even first attempt to knock on the door until after he had not only searched the yard but had also taken steps to secure the items of potential evidence he discovered. (September 29, 2017, Motions Hearing, Digital Recording at 11:27–11:29 a.m.; 11:34–11:37 a.m.).

For the foregoing reasons, the Court recommends **GRANTING** Defendant's Motion to Suppress Search of Defendant. [Docket No. 23].

### III.    CONCLUSION

Based on the foregoing and all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED THAT**:

1.    Defendant's Motion to Suppress Search of the Defendant, [Docket No. 23], be **GRANTED.**

Dated: November 6, 2017                                         s/Leo I. Brisbois
                                                                               Leo I. Brisbois
                                                                               U.S. MAGISTRATE JUDGE

**N O T I C E**

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "A party may file and serve specific written objections to a magistrate judge's proposed findings and recommendation within 14 days after being served with a copy of the recommended disposition[.]"  A party may respond to those objections within 14 days after being served a copy of the objections.  LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing.  If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.