## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| United States of America, | File No. 17-CR-173 (SRN/LIB) |
| **Plaintiff,** | |
| | **MEMORANDUM OPINION &** |
| v. | **ORDER ADOPTING REPORT** |
| | **AND RECOMMENDATION** |
| Duane James Neadeau, | |
| a/k/a D.J. Neadeau, | |
| **Defendant.** | |

---

Clifford B. Wardlaw and Deidre Y. Aanstad, United States Attorney's Office, 300 South Fourth Street, Ste 600, Minneapolis, MN 55415, for the Government.

Caroline Durham, 101 East 5th Street, Ste 2626, St. Paul, MN 55101; and Melvin R. Welch, Welch Law Firm, 332 Minnesota Street, Ste W-1610, St. Paul, MN 55101 for Defendant.

---

SUSAN RICHARD NELSON, United States District Judge

This matter is before the Court on the Report and Recommendation ("R&R") of Magistrate Judge Leo I. Brisbois dated November 6, 2017 [Doc. No. 54]. Magistrate Judge Brisbois recommends that this Court grant Defendant Duane Neadeau's Motion to Suppress Search of Defendant [Doc. No. 23]. The Government filed Objections to the R&R [Doc. No. 60], and Neadeau filed a Response to the Government's Objections [Doc. No. 61]. The Court has reviewed *de novo* those portions of the R&R to which the Government objects as required by 28 U.S.C. § 636(b)(1) and Fed. R. Crim. P. 59(b)(3). Based on that review, and as explained herein, the Court adopts the magistrate judge's R&R and grants Neadeau's motion.

## I.    BACKGROUND

On July 19, 2017, Neadeau was charged by indictment with one count of assault with a dangerous weapon in violation of 18 U.S.C. §§ 113(a)(3), 1151, and 1153(a), and one count of assault resulting in serious bodily injury in violation of 18 U.S.C. §§ 113(a)(6), 1151, and 1153(a). (Indictment, Counts 1–2 [Doc. No. 1].) On August 21, 2017, Neadeau filed the underlying motion to suppress, and Magistrate Judge Brisbois held a hearing on the motion on September 29, 2017. (*See* Min. Entry for Sept. 29, 2017 Proceedings [Doc. No. 45]; Mot. Hr'g Tr. ("Tr.") [Doc. No. 53].) At the hearing, the Government called three witnesses—Red Lake Police Department Officer Joshua Wicker ("Officer Wicker"), then-Criminal Investigator Paul Smith ("Investigator Smith"), and FBI Agent Travis Putrah ("Agent Putrah"). (*See* Tr. at 2.) All three witnesses were involved in the investigation on the night of the alleged assault. (*See id.*) Below, the Court recites the factual background based on these officers' testimony, followed by a summary of the procedural posture of this case, including the magistrate judge's findings of fact and conclusions of law.

### A.  Factual Background

In the early morning hours of July 17, 2016, Officer Wicker was on duty on the Red Lake Reservation in Northern Minnesota. (Wicker Test., Tr. at 36–37.) Around midnight, dispatch alerted him that there was a male covered in blood walking on West End Road. (*Id.* at 37.) When Officer Wicker arrived at this location, he saw Thomas Sayers with multiple stab wounds on his body, including a large laceration on the side of his face. (*Id.* at 37, 45.) Officer Wicker asked Sayers "who had done this to him and where they were," and Sayers responded that "D.J. Neadeau had stabbed him and that he lived two houses down." (*Id.* at

38.) Sayers was then transported by ambulance to the Red Lake Indian Health Service Hospital, and Officer Wicker called Investigator Smith to alert him of the alleged stabbing. (*Id.* at 37.)

Officer Wicker followed the ambulance to the hospital. (*Id.*) He testified that he did so because he "wanted to get an exact location from Thomas [Sayers] of where the incident happened." (*Id.* at 38.) But when Officer Wicker attempted to get more details from Sayers, Sayers declined to provide any, responding, "That's your job." (*Id.* at 47.) By approximately 12:45 a.m., Investigator Smith had also arrived at the hospital. (Smith Test., Tr. at 90.) Investigator Smith learned from Officer Wicker that "Duane Neadeau was the suspect," but Sayers also refused to give Investigator Smith any additional information. (*Id.* at 71.) Nevertheless, Investigator Smith instructed Officer Wicker to "go to the scene and secure the scene." (*Id.*) Investigator Smith then contacted his department and called Agent Putrah of the FBI at approximately 12:45 a.m. (*Id.*; Putrah Test., Tr. at 12.)

Knowing only that Sayers had identified Neadeau as the person who had stabbed him, Officer Wicker drove to Neadeau's home along with another officer identified as Officer Graves.[1] (Wicker Test., Tr. at 38, 41, 51, 55–56.) Neadeau's home—which Officer Wicker testified is located a "[c]ouple hundred yards away" from where he first encountered Sayers, (*id.* at 58)—is accessible via a dirt road, or driveway, off of West End Road, (*id.* at 49–50). Officer Wicker and Agent Putrah both testified that Neadeau's home is not completely visible from West End Road. (Wicker Test., Tr. at 50; Putrah Test., Tr. at 30).

---

[1] Officer Wicker was able to determine the location of the Neadeau home from other officers who were on duty that night.  (Wicker Test., Tr. at 38.)

Both officers testified that the dirt driveway leading up to the house runs through the woods, (Wicker Test., Tr. at 50; Putrah Test., Tr. at 29–30), and Officer Wicker testified that the house was surrounded by woods. (Wicker Test., Tr. at 50.)

Both Officer Wicker and Agent Putrah also testified as to the orientation of the home. Officer Wicker testified that as he approached from the dirt road, Neadeau's home was on the right. (*Id.* at 49.) According to Officer Wicker, the front door is on the southwest side of the home and the backyard is north-northeast bearing. (*Id.* at 51.) Officer Wicker testified that the backyard is not visible from the front of the house. (*Id.* at 53.) Similarly, Agent Putrah testified that there is a "doorway on the south side of the residence and [he] believe[s] there's also a door on the east side of the residence." (Putrah Test., Tr. at 24.)

Officer Wicker arrived at Defendant's home at approximately 1:01 a.m. (Wicker Test., Tr. at 49.) He parked in front of the house on the west side. (*Id.* at 51.) Upon arriving at Neadeau's home, Officer Wicker "checked the driveway and the front porch and the front area of the residence for blood." (*Id.* at 52.) He did not knock on the door. (*Id.*) Rather, he "began looking around th[e] residence to try and locate a crime scene, see if there was anything in the area." (*Id.* at 38). The house was unlit, so Officer Wicker used a flashlight. (*Id.* at 52.)

Officer Wicker testified that he first started out from the west—at the front of the house—headed south, and then went southeast. (*Id.* at 53.) Officer Wicker testified that on the east side of the residence, as he came around the south side, he "observed that there were burn-out tire marks on the south side of the residence." (*Id.* at 38–39.) Officer Wicker further testified that he then continued around to the east side of the home—the backyard,

(*see id.* at 53)—where he "located about two pools of blood, along with a bent knife in the shape of a U." (*Id.* at 39.) Officer Wicker also testified that it was raining when he was at Neadeau's home, although the precise timing of when the rain began is unclear from the record. (*Id.* at 40.) According to Officer Wicker, "the heavy rainfall" was "washing the blood off of the knife" and was causing the pools of blood to "dissipate into the ground and wash away." (*Id.*) To try to protect the knife from the rainfall, Officer Wicker "placed a brown paper evidence bag over the knife to prevent . . . any more loss of blood from the knife." (*Id.*) Officer Wicker also "located a trail of blood heading from the east side of the residence east into the woods, where there was a matted-down section of grass." (*Id.* at 39.)

After finding this evidence, Officer Wicker took pictures of what he had found, "exited the crime scene as safely as [he] could without disturbing it[,] and set up a perimeter of the residence with other officers." (*Id.*) In the report that Officer Wicker prepared after the incident, he indicated that he located the knife at 1:01 a.m.—the same time he indicated he had arrived at Neadeau's home. (*Id.* at 49.)

About an hour after first arriving on the scene and setting up a perimeter, the officers finally entered the home. (*Id.* at 41, 56–57.) Officer Wicker testified that after officers had set up a perimeter, they "attempt[ed] to knock and make contact . . . and see if there was anybody inside the residence." (*Id.* at 59.) No one responded to the knocks or Officer Wicker's announcement as "police." (*Id.* at 59, 60–61.) Although the timing is unclear, at some point before the officers knocked, Officer Wicker was told that someone had observed movement of a curtain inside of the house. (*Id.* at 61.) Officer Wicker testified that he found it "suspicious that nobody [wa]s answering the door" after he knocked, and that the lack of

response could be because other injured parties may be inside and unable to respond because they are "bleeding out," or because people are "trying to hide because . . . they know that they did something wrong." (*Id.* at 60.) After entering the home, the officers located two people in the basement, one of whom was Neadeau. (*Id.* at 41–42.)

Agent Putrah testified that he arrived at Neadeau's home at approximately 2:15 a.m. (Putrah Test., Tr. at 22.) Agent Putrah's testimony generally corroborated the testimony of Officer Wicker with respect to the location where the officers found the knife and pools of blood. Agent Putrah testified that he collected evidence from a "deer stand that was outside on the northeast corner of the residence," from "some leaves or grass that was further away" on the "outside exterior of the house," and from "right next to the house on the northeast corner." (*Id.* at 17.) Agent Putrah indicated that the items that were collected were on the backside of the residence, (*id.* at 26), and further stated that "the scene that was secured was on that east and northeast side of the house," (*id.* at 18).

At no point during these events did the law enforcement officers obtain a warrant. (*Id.* at 19.) Agent Putrah testified that after Investigator Smith called him from the hospital and Agent Putrah was on his way to Neadeau's home, he attempted to reach an Assistant United States Attorney. (*Id.*) Agent Putrah was unable to reach her, but "left a message on her cell phone to let her know that [he] would be seeking a search warrant for the property." (*Id.*) Agent Putrah testified that these efforts were abandoned, however, because "[he] was concerned that by the time [he] obtained that search warrant the blood would be gone or the evidence would be gone" because of the rain. (*Id.*)

### B.  Procedural Posture

After the hearing on the motion, the parties filed supplemental briefing. (*See* Def.'s Mem. Supp. Mot. Suppress ("Def.'s Mem.") [Doc. No. 49]; Gov't's Resp. [Doc. No. 50].) Neadeau argued that the evidence found on his property on the morning of July 17 should be suppressed because law enforcement violated his Fourth Amendment rights by entering and searching the curtilage of his home without a warrant or any exigency justifying warrantless searches. (*See* Def.'s Mem.)

The Government opposed, arguing that "[t]here were exigent circumstances present that required that law enforcement act to determine if there were other stabbing victims and to collect physical evidence without a warrant." (Gov't's Resp. at 2.) The Government also argued that the "knock and talk" rule applied to this case, providing that "'no Fourth Amendment search occurs when police officers [who] enter private property restrict their movements to those areas generally made accessible to visitors—such as driveways, walkways[,] o[r] similar passageways' to make their presence known or make inquiries." (*Id.* at 4 (quoting *United States v. Wells*, 648 F.3d 671, 679 (8th Cir. 2011).)

On November 6, 2017, Magistrate Judge Brisbois issued an R&R recommending to this Court that Neadeau's motion to suppress be granted. As an initial matter, analyzing the four factors enunciated in *United States v. Dunn*, 480 U.S. 294 (1987), Magistrate Judge Brisbois found that the area which law enforcement entered—the side and backyard of Neadeau's home—was the curtilage of the home.[2] (R&R at 8–10.) The magistrate judge

---

[2] The *Dunn* factors are: "[1] the proximity of the area claimed to be curtilage to the home, [2] whether the area is included within an enclosure surrounding the home, [3] the nature

found that "the side and back yard are immediately adjacent to [Neadeau]'s home and of no great size." (*Id.* at 8.) Moreover, the magistrate judge found, "the entirety of the area at issue, including [Neadeau]'s home, is enclosed within a wooded area which law enforcement described as surrounding the home." (*Id.*) As to the remaining *Dunn* factors, the magistrate judge found that the backyard "was not visible from the road or the driveway where the officers parked their vehicles, nor even from the front yard, and each officer testified that the house itself could not be seen from the road as the house was surrounded by woods." (*Id.* at 9.)

Next, Magistrate Judge Brisbois found that the search of the curtilage violated Neadeau's Fourth Amendment rights because it was conducted without a warrant and no exigent circumstances justified the warrantless search. (*Id.* at 11–21.) Specifically, Magistrate Judge Brisbois rejected claims by the Government that the "immediate aid" or "safety" exigent circumstances exception to the warrant requirement applied in this case, concluding that an "'objectively reasonable basis' to believe that someone within the house or curtilage is in immediate need of assistance" was lacking in this case. (*Id.* at 12–15 (quoting *Michigan v. Fisher*, 558 U.S. 45, 47 (2009).) The magistrate judge rejected the Government's position that Officer Wicker could lawfully enter the curtilage of Neadeau's home "to determine if there were any other stabbing victims," (*id.* at 16 (quoting Gov't's Resp. at 5)), concluding that any suspicion that Officer Wicker had that there may be

---

of the uses to which the area is put, and [4] the steps taken by the resident to protect the area from observation by people passing by." 480 U.S. at 301.

additional stabbing victims "was based solely on speculation," (*id.*). Magistrate Judge Brisbois found that:

> Officer Wicker had not been informed by [Sayers] where the assault had occurred, did not observe any violent behavior at [Neadeau]'s residence, did not hear any evidence of any assault or immediate danger, and did not see any signs to indicate that anyone had been injured at [Neadeau]'s residence until <u>after</u> Officer Wicker entered into and began searching the curtilage of [Neadeau]'s home."

(*Id.* at 15.)

Similarly, the magistrate judge rejected the Government's contention that the rain's purported destruction of evidence constituted an exigent circumstance justifying a warrantless search. (*Id.* at 18.) Magistrate Judge Brisbois found that because Officer Wicker was not lawfully on the curtilage when he first viewed the bloody knife and pools of blood, his warrantless search of the curtilage "cannot be saved under the destruction of evidence exception." (*Id.* (citing *Kentucky v. King*, 563 U.S. 452, 460–63 (2011).)

Finally, Magistrate Judge Brisbois rejected the Government's contention that the "knock and talk" principle justified the officers' presence in the backyard when they found the evidence. (*Id.* at 9, 19–20.) The magistrate judge found that neither of the rule's two justifications existed here, as "Officer Wicker did not observe any of the items of evidence now at issue from a driveway, walkway, or other similar passageway," (*id.* at 19), and he did not knock on the front door before going to the curtilage and backyard as required by the Eighth Circuit in cases applying the "knock and talk" rule, (*id.* at 20 (citing *Wells*, 648 F.3d at 680)).

The Government filed a timely objection to the R&R. (*See* Gov't's Obj.) The Government concedes that the area which law enforcement entered and searched was the

curtilage of Neadeau's home and does not challenge the R&R's conclusion that the "knock and talk" principle is inapplicable here. (*See id.* at 5.) The Government does, however, challenge the R&R's conclusion regarding the existence of exigent circumstances. (*Id.* at 5–10.) Specifically, the Government argues that the warrantless entry and search were justified by both probable cause and exigent circumstances. (*Id.* at 6.) According to the Government, "[t]here was probable cause to believe that the defendant committed the felony assault." (*Id.* at 9.) As to exigent circumstances, the Government renews its arguments that (1) police officers needed to act to prevent the destruction of evidence, and (2) the officers had a legitimate concern for the safety of themselves or others. (*Id.* at 7–8.)

## II.    DISCUSSION

The district court must undertake an independent, *de novo* review of those portions of the R&R to which a party objects and "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C); *see also* D. Minn. LR 72.2(b)(3).

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "It is axiomatic that the 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.'" *Welsh*, 466 U.S. 740, 748 (1984) (quoting *United States v. United States District Court*, 407 U.S. 297, 313 (1972)). Accordingly, a basic principle of Fourth Amendment law is that "searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton v. New York*, 455 U.S. 573, 586 (1980). This presumption, however, may be overcome if "the

10

circumstances meet an established exception to the warrant requirement, such as the presence of exigent circumstances." *United States v. Leveringston*, 397 F.3d 1112, 1114 (8th Cir. 2005) (citing *Payton*, 445 U.S. at 589–90). The protections guaranteed by the Fourth Amendment extend to the curtilage of the home, which is "the area to which extends the intimate activity associated with the sanctity of a man's home and the privacies of life." *United States v. Weston*, 443 F.3d 661, 666–67 (8th Cir. 2006) (quoting *Oliver v. United States*, 466 U.S. 170, 180 (1984)).

The exigent circumstances exception to the warrant requirement "justifies immediate police action without obtaining a warrant if lives are threatened, a suspect's escape is imminent, or evidence is about to be destroyed." *United States v. Ramirez*, 676 F.3d 755, 759 (8th Cir. 2012) (quoting *United States v. Ball*, 90 F.3d 260, 263 (8th Cir. 1996)). Nevertheless, "the exigent-circumstances exception is narrowly drawn," *United States v. Francis*, 327 F.3d 729, 735 (8th Cir. 2003) (citation omitted), and "the police bear a heavy burden when attempting to demonstrate an urgent need that might justify warrantless searches or arrests." *Welsh*, 466 U.S. at 749–50.

When evaluating whether a warrantless entry was justified by exigent circumstances, this Court must "consider the circumstances that confronted the police at the time of the entry." *Leveringston*, 397 F.3d at 1116. This analysis centers not on the subjective beliefs of the officers involved, but rather on "what an objectively reasonable officer on the scene could have believed." *Id.* "[I]f such an officer would have had sufficient grounds to believe there was an exigency, then the Fourth Amendment did not require a

11

warrant, and the suspect's constitutional rights were not violated by a warrantless entry." *Id.* (citations omitted).

In this case, because the Government concedes that law enforcement officers entered and searched the curtilage of Neadeau's home without a warrant, the Court focuses on whether the Government has met its "heavy burden" of establishing that the warrantless entry and search were justified by exigent circumstances.

### A. Destruction of Evidence

The Government first argues that the warrantless entry into the curtilage of Neadeau's home was justified by the risk of imminent destruction of evidence. (Gov't's Obj. at 6). "[T]he need 'to prevent the imminent destruction of evidence' has long been recognized as a sufficient justification for a warrantless search." *King*, 563 U.S. at 460 (quoting *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006)). In *United States v. Quarterman*, the Eighth Circuit recently clarified that this exception to the warrant requirement requires sufficient grounds to reasonably believe that there was an exigency as well as probable cause to believe the evidence exists. 877 F.3d 794, 794 (8th Cir. 2017) (citing *United States v. Cisneros-Gutierrez*, 598 F.3d 997, 1004 (8th Cir. 2010) ("[T]here must be probable cause of evidence in cases involving entry and search justified by a risk of removal or destruction of evidence.").

In a number of cases, the Eighth Circuit has applied this rule to uphold law enforcement officers' warrantless entry into a suspect's home where, "after going to a residence with evidence that an individual was involved in a drug transaction, [police officers] knock and identify themselves and then witness an individual retreat or conduct

12

himself in a way that suggests the destruction of evidence." *Cisneros-Gutierrez*, 598 F.3d at 1004 (collecting precedent). For instance, in *United States v. Leveringston*, the Eighth Circuit affirmed the district court's application of the destruction of evidence exception. 397 F.3d at 1115–17. In that case, a hotel manager alerted the officers of signs of suspicious drug activity inside the room. *Id.* at 1116. When the police knocked, the defendant looked through the curtains, expressed surprise, and immediately shut the curtains. *Id.* The officers then heard "pots and pans slamming, dishes breaking, water flowing, and a garbage disposal running." *Id.* Although the officers did not enter at that precise moment, the Eighth Circuit concluded that had they done so, their warrantless entry "would have been justified by probable cause that evidence of drug trafficking was within and that destruction of evidence was imminent." *Id.*

The Eighth Circuit has applied the same rule—requiring probable cause of evidence and reasonable grounds to conclude that an exigency existed—to cases involving methamphetamine labs. *See, e.g.*, *Kleinholz v. United States*, 339 F.3d 674, 676–78 (8th Cir. 2003) (warrantless entry into home upheld where officers had probable cause to believe a methamphetamine lab was located in defendant's home and "volatile nature of such labs" creates exigency justifying immediate but limited search); *Francis*, 327 F.3d at 734–37 (affirming lower court's determination that exigent circumstances existed to justify warrantless search of home due to the volatile nature of chemicals associated with methamphetamine labs); *United States v. Walsh*, 299 F.3d 729, 734 (8th Cir. 2002)

(upholding a limited warrantless search where officers had probable cause to believe that they had discovered a methamphetamine lab).[3]

A widely recognized principle arising from these cases is that the destruction of evidence exception to the warrant requirement is less compelling in situations, like this one, which do not involve drugs. As the Eleventh Circuit has opined, "the need for the exigent circumstance doctrine is particularly compelling in narcotics cases, because contraband and records can be easily and quickly destroyed while a search is progressing." *United States v. Young*, 909 F.2d 442, 446 (11th Cir. 1990) (citing *United States v. Johnson*, 802 F.2d 1459, 1462 (D.C. Cir. 1986)); *see also King*, 563 U.S. at 461 ("Destruction of evidence issues probably occur most frequently in drug cases because drugs may be easily destroyed by flushing them down a toilet or rinsing them down a drain."). In fact, the Eighth Circuit has primarily applied the destruction of evidence exception in cases involving drugs. *See, e.g.*, *United States v. Amburn*, 412 F.3d 909, 915–16 (8th Cir. 2005) (reasonable for officers to believe that destruction of evidence was likely to occur where, *inter alia*, they had sources indicating that drugs were being produced in the residence and officers observed two burn piles in defendant's yard); *United States v. Pierson*, 219 F.3d 803, 805–06 (8th Cir. 2000) (holding that exigent circumstances justified a warrantless entry into hotel room where defendant was arrested just outside of room and co-defendant was still in the room, ostensibly aware of defendant's arrest, and could have destroyed drugs); *Ball*, 90

---

[3] The exigency justifying warrantless entry in these cases is related to safety as opposed to the destruction of evidence. Nevertheless, the Eighth Circuit has required the existence of probable cause that illegal contraband is present. *See Quarterman*, 877 F.3d at 794 (noting that the probable cause required in cases involving illegal methamphetamine labs "is that a lab is inside" the place searched).

F.3d at 262–64 (holding that destruction of evidence and concern for officer safety were exigent circumstances justifying warrantless entry into home where officer observed armed man on porch conducting narcotics transaction and then running into home). Consistent with this principle, some courts have rejected the government's destruction of evidence argument where the evidence was of such a nature as to not be easily destroyed. *See State v. Naujoks*, 637 N.W.2d 101, 108–09 (Iowa 2001) (rejecting claim of exigent circumstances on basis of potential destruction of evidence because stolen television and stereo equipment would have been very difficult to destroy or disfigure).

In this case, based on Eighth Circuit precedent, this Court concludes that the potential for the destruction of evidence did not constitute an exigency justifying the warrantless entry and search of the curtilage of Neadeau's home. The Government has failed to show that it had both probable cause and sufficient grounds—*prior* to the warrantless entry—to believe that evidence would be imminently lost or destroyed without police action.

As to probable cause, immediately before the warrantless entry, law enforcement did not have "probable cause that evidence of [the assault] was *within*" the curtilage of Neadeau's home. *Leveringston*, 397 F.3d at 1116 (emphasis added). As correctly found by the magistrate judge, when the officers entered the curtilage, they had no information indicating that the assault had occurred there, or that evidence of the crime would be found in the backyard. At the moment before entry, Officer Wicker had only been apprised of two facts: that Sayers had identified Neadeau as the person who had stabbed him and that he lived "two houses down." (Wicker Test., Tr. at 38, 47.) In fact, on cross-

15

examination, Officer Wicker acknowledged that Sayers did not tell him that the incident had happened inside Neadeau's home or in the backyard, did not indicate that anyone else had been injured or that a knife was involved, and did not otherwise say anything else about the incident. (*Id.* at 47–48, 55–56.) Sayers refused to give law enforcement any more information. Officer Wicker also testified that he could not see the backyard from the front of the house, including the knife and pools of blood.

The Government's arguments to the contrary are unpersuasive. The Government first states that "[t]here was probable cause to believe that the defendant committed the felony assault." (Gov't's Obj. at 9.) In support of this contention, the Government asserts: (1) that the victim stated that "DJ Neadeau did it and he was at his home"[4]; (2) that Officer Wicker testified that Neadeau's home was "located a couple hundred yards away from where he found the victim walking alongside the road"; and (3) that it "was reasonable to conclude that [Neadeau] would be at his home" around midnight. (*Id.*) While the police may have had probable cause to believe that Neadeau committed the felony assault, there was no probable cause to believe that illegal activity was afoot in the curtilage. For the reasons already articulated, the Government has failed to show that it had reasonable grounds to believe that evidence of the assault would be found in the curtilage of Neadeau's home.

---

[4] The Court notes that Officer Wicker did not indicate that Sayers stated that Neadeau was at his house. The transcript indicates that when Officer Wicker asked Sayers "who had done this to him and where they were," Sayers responded "that D.J. Neadeau had stabbed him and that he lived two houses down." (Wicker Test., Tr. at 38.)

But even if this Court were to conclude that law enforcement had the requisite probable cause, the Government has failed to meet its burden of showing that, at the relevant moment, law enforcement officers had "sufficient grounds to believe there was an exigency," *i.e.*, that evidence would be lost or destroyed. *Leveringston*, 397 F.3d at 1116. Here, the Government argues that the rain was washing away the pools of blood and the blood on the knife. (Gov't's Obj. at 7.) The Government's argument, however, improperly focuses on events that occurred *after* law enforcement had already entered and searched the curtilage of Neadeau's home. While it may be true that the rain was washing away blood, the Government fails to articulate any facts demonstrating that law enforcement had grounds to believe loss of evidence was imminent or already underway before the warrantless entry.[5] Although it is true that police officers "need not . . . wait until the evidence is in the process of being destroyed," *United States v. Clement*, 854 F.2d 1116, 1119 (8th Cir. 1988) (citing *United States v. Blake*, 484 F.2d 50, 55 (8th Cir. 1973)), this Court is not aware of any Eighth Circuit case law upholding warrantless searches where law enforcement could not articulate grounds for believing that evidence would be destroyed *before* the warrantless entry. *See Ramirez*, 676 F.3d at 763 (reversing denial of motion to suppress, finding that at the time of warrantless entry, officers "had no indication whatsoever that there was any activity at all in the hotel room, let alone any activity that might lead them to believe" that evidence would be imminently destroyed).

---

[5] Neadeau asserts that the rain did not begin until 1:45 a.m.—long after Officer Wicker had entered and searched the curtilage. (*See* Def.'s Resp. at 7.) However, the magistrate judge did not make this factual finding and this Court finds it unnecessary to reach the issue.

In sum, this Court agrees with the magistrate judge and concludes that the Government has failed to show that it both had probable cause and objectively reasonable grounds to believe that evidence would be destroyed if not for a warrantless entry.

### B.    Safety Concerns

The Government also argues that exigent circumstances justifying the warrantless entry existed because law enforcement had a legitimate concern for the safety of themselves or others. (Gov't's Obj. at 8–9.) A "legitimate concern for the safety of law enforcement officers or other individuals constitutes exigent circumstances that justify warrantless entry." *United States v. Hill*, 430 F.3d 939, 941 (8th Cir. 2005) (citations and internal quotations omitted). Moreover, "[e]xigent circumstances exist if a reasonable law enforcement officer could believe that a person 'is in need of immediate aid.'" *United States v. Chipps*, 410 F.3d 438, 442 (8th Cir. 2005) (quoting *Mincey v. Arizona*, 437 U.S. 385, 392–93 (1978)). Under this exception to the warrant requirement, however, "[i]f officers have an objectively reasonable basis that some immediate act is required to preserve the safety of others or themselves, they do not also need probable cause." *Quarterman*, 877 F.3d at 794 (citations omitted).

Here, the Court concludes that the Government has not demonstrated that an objectively reasonable officer would have had sufficient grounds to believe that an immediate entry into the curtilage was necessary to ensure the safety of law enforcement or any other individual. In this case, the risk to officer safety was no more than that inherent in investigating crime. *See Naujoks*, 637 N.W.2d at 109 (concluding that there was no safety-based exigency because the "situation did not involve any objective indication of fear of

18

violence or jeopardy more than any other police encounter with persons suspected of criminal activity would involve"). As soon as Officer Wicker arrived at the Neadeau home, he looked around the front area before immediately proceeding to the curtilage. His testimony offered no indication that, before his warrantless entry, he observed movement inside the home or suspicious behavior necessitating a warrantless entry to ensure anyone's safety or to render emergency aid. Moreover, as already described, Officer Wicker had no indication when he arrived at the Neadeau home that Neadeau was inside, much less that there were weapons in the home or in the curtilage. *See Hill*, 430 F.3d at 941–42 (holding that warrantless entry into home was justified where, "*in addition* to the violent crime for which [defendant] was being arrested," officers saw another man observe them, run back into defendant's home, and defendant's wife then denied this man's presence inside house); *United States v. Vance*, 53 F.3d 220, 222 (8th Cir. 1995) (safety exigency justified warrantless entry where "officers had been informed that there were other individuals and weapons in the house").

Furthermore, this is not a case where, for example, officers were responding to reports of domestic violence and an individual covered in blood told them that children were inside the home, justifying a warrantless entry into an open garage to speak with an occupant. *United States v. Scott*, 876 U.S. 1140, 1143–44 (8th Cir. 2017).[6] Nor is this a case where, after arresting a fleeing suspect, officers noticed blood on his hand and shirt and,

---

[6] After filing objections to the R&R, the Government brought this case to the Court's attention in support of its position. (Dec. 14, 2017 Letter [Doc. No. 62].) Neadeau responded, arguing that *Scott* is distinguishable from the present case. (Jan. 3, 2018 Letter [Doc. No. 66].) This Court agrees with Neadeau that *Scott* is distinguishable and does not support the Government's position.

combined with loud sounds of a commotion inside a hotel room, the officers subsequently made a warrantless entry to ensure no one inside was in immediate need of aid. *Leveringston*, 397 F.3d at 1117. And finally, this is not a case where, responding to an assault that reportedly had occurred *at* defendant's home, officers saw a drop of blood near the front door and followed the trail of blood into the curtilage of the home to find a blood-stained sweatshirt. *Chipps*, 410 F.3d at 442. The present record is devoid of comparable factors that would have led a reasonable officer to legitimately be concerned for his safety or that of others, or to reasonably believe that someone was in need of immediate assistance. *See also United States v. Kuenstler*, 325 F.3d at 1015, 1021 (8th Cir. 2003) (legitimate safety concerns existed where one defendant resisted arrest outside of home, woman ran out of house screaming threats, officers became aware that another person was watching them from inside of doorway of house where there might be a drug lab); *United States v. Collins*, 321 F.3d 691, 695 (8th Cir. 2003) ("immediate aid" exigency justified officer leaning into vehicle to confirm that men inside were not injured where officer was responding to area where shots were reportedly fired).

In its objection, the Government fails to advance any persuasive arguments to the contrary. The Government simply states that "the potential hazards of an armed subject who has already stabbed a citizen with a dangerous weapon are obvious"—especially when it is dark out—and that "[t]he threat is not only to other citizens but also to the police officer." (Gov't's Obj. at 8.) Understandably, the Government focuses on the seriousness of the alleged crime. But although "an important factor to be considered when determining whether any exigency exists is the gravity of the underlying offense," critically, "no

20

exigency is created simply because there is probable cause to believe that a serious crime has been committed." *Welsh*, 466 U.S. at 752 (citation omitted). Without more, the Court is unable to conclude that an exigency existed merely because it was dark out and police were investigating a violent crime.

Furthermore, the Government's arguments for why exigent circumstances existed fail to give careful consideration to the timeline of events. The Government states that "[t]he safety concerns were heightened because there was no answer when the police knocked on the front door." (Gov't's Obj. at 8.) However, Officer Wicker did not knock on the front door or otherwise attempt to contact anyone inside the home until after he had already made a warrantless entry into the curtilage and secured the perimeter. Whether anyone answered the door an hour after the warrantless search was conducted is irrelevant to the question of whether an exigency existed at the moment Officer Wicker entered the curtilage for the first time. *See United States v. Poe*, 462 F.3d 997, 1000–01 (8th Cir. 2006) (citations omitted) (proper inquiry considers the facts and circumstances known to the officer at the time of entry). On these facts, and mindful that "[t]he Fourth Amendment does not require certitude before police may act without a warrant to protect persons," *Leveringston*, 397 F.3d at 1117, this Court is unable to conclude that an objectively reasonable police officer under these circumstances would have had sufficient grounds to believe that a safety-based exigency existed to justify a warrantless entry and search.

As the Supreme Court has explained, "the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant." *Payton*, 445 U.S. at 590. Here, based on a *de*

*novo* review of the record and the parties' arguments, the Court agrees with the magistrate judge that a warrantless entry into and search of the curtilage of Neadeau's home was not justified by exigent circumstances and thus violated the Fourth Amendment. Accordingly, the Court adopts the magistrate judge's R&R and grants Neadeau's motion to suppress.

## III.     ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED that:**

1. Magistrate Judge Brisbois's R&R of November 6, 2017 [Doc. No. 54] is **ADOPTED**; and

2. Defendant's Motion to Suppress Search of Defendant [Doc. No. 23] is **GRANTED**.


Dated: January 5, 2018                          s/Susan Richard Nelson
                                                        SUSAN RICHARD NELSON
                                                        United States District Judge

22